# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LEONARD THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-00443-JMS-DKL |
| | ) | |
| DOCTOR WILLIAM H. WOLFE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### Entry Discussing Defendants' Motions for Summary Judgment

Plaintiff Leonard Thomas, an inmate at the Westville Correctional Facility, filed this civil action pursuant to 42 U.S.C. § 1983 based on events which occurred at the Pendleton Correctional Facility ("Pendleton") from April 2010 through April 2012. Mr. Thomas's primary complaint is that he was denied adequate medication (Dilantin) and accommodations (bottom range pass) for his seizures in violation of his Eighth Amendment rights. As a result, Mr. Thomas allegedly had seizures and was injured. The Defendants, Dr. William Wolfe, Nurse Practitioner Vanessa Suffoletta, Nurse Deborah Wallen, Nurse Mary Blomquist, Nurse Linda Ashby and Yvonne Goodson (collectively the "Medical Defendants") filed a motion for summary judgment on September 25, 2015. That same day, defendants Andrew Cole and Danny Fountain (collectively the "State Defendants") filed their motion for summary judgment. Mr. Thomas has opposed both motions in a single brief. Dkt. 126.[1]

---

[1] Thomas states in the title of his 41-page response brief that he is renewing his motion for the appointment of counsel to help respond to the defendants' motions for summary judgment. This request is **denied.** Thomas's need for counsel has been well documented in this case. In fact, counsel was recruited to represent Mr. Thomas but he rejected that assistance without good cause.

For the reasons explained below, the Medical Defendants' motion for summary judgment is **granted in part and denied in part** [dkt. 113] and the State Defendants' motion for summary judgment [dkt. 116] is **denied**.

As a preliminary matter, Mr. Thomas's motion for expert witness [dkt. 149] is **denied.** This motion is untimely because it was filed after the close of discovery and after the motions for summary judgment were fully briefed. Given the current record, no court-appointed expert witness pursuant to Rule 706 is appropriate because there is no evident need for an expert, to "assist the trier-of-fact to understand the evidence or decide a fact in issue." *Ledford v. Sullivan*, 105 F.3d 354, 358 -359 (7th Cir. 1997) (citing Fed. R. Evid. 702). For these reasons, the motion for appointment of an expert witness [124] is **denied.**

### I. Background

This action was screened as required by 28 U.S.C. § 1915A and the following claims were identified [dkt. 38]:[2]

1.  *Eighth Amendment; Denial of Dilantin and Bottom Range Pass.* Doctor William H. Wolfe and Nurse Practitioner Vanessa G. Suffoletta allegedly denied Mr. Thomas the medication

The Court simply does not have the resources to recruit serial counsel for pro se litigants, especially where, as here, representation by recruited counsel was unreasonably opposed and obstructed by Mr. Thomas himself. Additional efforts to recruit counsel on briefing matters will not be undertaken. See dkts.76, 81 and 87. The Court may reconsider appointment of counsel should the case proceed to trial.

[2] Mr. Thomas was specifically instructed to notify the Court by no later than August 20, 2014, if he believed that additional claims were alleged in the complaint, but not identified by the Court. Dkt. 38. No additional claims were identified. These circumstances make the Medical Defendants statement of the issues in their motion for summary judgment briefing particularly confusing. See dkt. 114 at p. 1-2. The issues identified and briefed by the Medical Defendants do not directly align with the claims identified by the Court and accepted as complete by Thomas.

Dilantin and a bottom range pass. As a result, Mr. Thomas had a seizure and injured himself on the stairs in violation of the Eighth Amendment.

2. *Eighth Amendment; Denial of or Interference with Medical Treatment.* Nurse Mary Blomquist, Nurse Wallen, Nurse Lindy Ashby and Medical Records Clerk Yvonne Goodson allegedly falsified records, the effect of which was that Mr. Thomas was denied medical care for his seizures.

3. *First Amendment; Retaliation.* Yvonne Goodson allegedly retaliated against Mr. Thomas for submitting health care request forms and seeking copies of his medical records by issuing him a conduct report in violation of the First Amendment.

4. *Eighth Amendment; Conditions of Confinement.* Andrew Cole and Counselor Fountain allegedly had the authority to move Mr. Thomas to a bottom or low range but refused to do so even after Mr. Thomas informed them that such a move was necessary to prevent injury.

## II. Standard of Review

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Pro.

3

56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. Pro. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.,* 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id.* at 901.

Mr. Thomas responded to the defendants' motions with a 41-page response. [3] See dkt. 126. The State defendants then filed a motion to strike some of Mr. Thomas's exhibits. Specifically, the State Defendants request that the Court strike 42 specifically identified documents. The State defendants argue that these documents are irrelevant, needlessly cumulative, not properly authenticated or are otherwise inadmissible. The motion to strike [dkt. 137] is **denied** because Local Rule 56-1 states that any dispute over the admissibility or effect of evidence must be raised through an objection within a party's brief. Similarly, the Medical Defendants' objection to the plaintiff's designation of evidence is overruled as presented. The Medical Defendant's objection

---

[3] Local Rule 7-1 states that supporting and response briefs may not exceed 35 pages. The court would have allowed the plaintiff to file his 41-page brief if he had requested permission to do so. An extended page limit is justified because the plaintiff handwrites his filings resulting in fewer words per page and he was responding to two motions. But in the future, Mr. Thomas should seek permission to file an oversized brief.

should have been (but was not) included in their reply brief.[4] That said, this Court shall apply Local Rule 56-1 such that only evidence which would be admissible at trial will be considered in ruling on the defendants' motions for summary judgment. See L.R. 56-1(e).

The key inquiry then, is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). When evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial ... against the moving party." *Celotex,* 477 U.S. at 330.

### III. Undisputed Facts

Consistent with the foregoing, the following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Thomas as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

---

[4] To make matters worse, the Medical Defendants' reply brief is already in excess of the 20-page limit allowed under Local Rule 7-1. Counsel should have sought permission to exceed the page limit. This request would have been denied, however, as unnecessary. The reply could have and should have been confined to 20-pages or less. For example, the Medical Defendants' decision to include a section entitled "Undisputed Material Facts" spanning 13-pages in the reply brief was utterly unnecessary. The facts listed appear to be substantially similar to the facts asserted in their Brief in Support of Summary Judgment. To the extent the facts are not duplicative, the new facts have been buried in the larger regurgitation. The decision to rehash the facts ad nauseam without any explanation is confusing, unhelpful, and ultimately resulted in a violation of Local Rule 7-1's page limits.

## A. The Parties

During the time period relevant to his complaint, Mr. Thomas was a 52-year-old inmate incarcerated at Pendleton. Mr. Thomas was diagnosed with epilepsy and schizophrenia and enrolled in the Chronic Care Clinic. As an offender enrolled in the Chronic Care Clinic, Mr. Thomas was seen by a medical provider every 90-days for his chronic condition and received regular lab work, including monitoring of his Dilantin levels and seizure activity.

Defendant Dr. William Wolfe is a physician licensed to practice medicine in the State of Indiana. Dr. Wolfe was one of several physicians at Pendleton who would see and treat inmates as they were placed on his schedule by nursing staff. He did not set or arrange the patient schedule.

Defendant Vanessa Suffoletta is a nurse practitioner licensed in the State of Indiana. She was a nurse practitioner at Pendleton. Nurse Practitioner Suffoletta had regular patients assigned to her for treatment. All other patients were assigned to the other physicians at Pendleton. Mr. Thomas was not one of Nurse Practitioner Suffoletta's regular patients. She had very limited involvement with Mr. Thomas's care.[5]

Defendants Deborah Wallen and Mary Blomquist are registered nurses working at Pendleton. Nurse Wallen and Nurse Blomquist are unable to diagnose medical conditions or order medical treatment for offenders or any other patients. As registered nurses, they triage offenders and communicate their medical needs to the provider and then follow the provider's orders. They cannot prescribe medications.

---

[5] Suffoletta testified that she did not treat Thomas's epilepsy or alleged seizure activity, but the IDOC's medical records reflect that she was the medical provider responsible for Thomas's care on October 20, 2011, after he suffered a seizure on the stairs on October 15, 2011. Thomas points to Suffoletta's signature on Health Care Request Forms identified as Exhibit 94 and 95. Dkt. 126 at p. 22. But no such exhibits could be located by the Court, see dkt. 126-3 at pp. 29 (exhibit 86(b)) to 30 (exhibit 96(a)).

Defendant Linda Ashby is a registered nurse who worked at Pendleton. Her duties and responsibilities included distributing prescribed medication to inmates and monitoring the inmates as they took the medications. Nurse Ashby was not permitted to diagnose medical conditions or to order medical treatment for offenders or any other patients.

Defendant Yvonne Goodson is currently, and was at all times relevant to Mr. Thomas's Complaint, the medical records clerk at Pendleton. As the medical records clerk, Goodson works under the Health Care Administrator and maintains the paper and electronic health records in the regular course of business, oversees requests for health records, and facilitates in-person offender reviews and copying of health records. Goodson is not involved in generating health records for offenders or documenting their medical care. Goodson is not involved in the disciplinary process at Pendleton and does not make decisions on whether to discipline an inmate.

From September 2011 to August 2012, Andrew Cole was the Classification Supervisor or Acting Classification Supervisor at Pendleton.

Danny Fountain was the Caseworker/Counselor in J Cell House at Pendleton in 2011.

**B. The Indiana Department of Correction's Request for Healthcare System**

The Indiana Department of Correction ("IDOC") follows a policy and procedure wherein offenders may initiate medical services through a Request for Healthcare Form ("HCF"). These forms are kept in all housing areas and are made available upon request from an offender.  Drop boxes for HCFs are available. Health care staff retrieves these forms from each drop box and reviews and responds to the requests daily. Depending upon the number of staff available and the time and circumstances of the form review, a two-step process occurs whereby one health care staff, typically a nurse, reviews the information, and schedules the offender to be evaluated by

another nurse in the clinic area, if necessary. Nursing staff do not schedule practitioner appointments in the absence of an appropriate clinical assessment.

## C. Bottom Range Pass

An offender who has a bottom range pass is to be housed on the first tier of a cell block. A bottom bunk pass requires that if the inmate is housed in a cell with bunked beds, the inmate is to sleep on the bottom bunk.  A bottom bunk pass is different from a bottom range pass.

If Fountain is approached by an inmate seeking a bottom range pass due to a medical issue, Fountain tells the inmate to submit a HCF so that medical personnel can determine if the inmate's medical condition requires him to be on the bottom range.  Fountain instructs the inmate to let him know if medical personnel determine that the inmate should be housed on the bottom range so that Fountain can start the process of getting him a bottom range pass. Fountain does not place a request into the Classification Department for an individual to be housed on the bottom range unless the inmate produces a medical order indicating that he should be placed on the bottom range. If medical verifies the order, Fountain will then put in a request to the Classification Department indicating that the inmate should be moved to a bottom range cell.

When a bottom range assignment is necessary due to a medical matter, the Classification Department relies on medical personnel to make the recommendation. The medical recommendation will be accommodated if at all possible. Usually, the Classification Department evaluates requests for a bottom range pass when the Unit Team or Counselor indicates that one should be issued. If the offender contacts the Classification Department directly about a bottom range pass, the Classification Department will usually tell the inmate to take it up with his counselor.

If an order verifying the need for a bottom range pass has been issued by medical personnel, the Classification Department places a note in the Location History section in the Offender Information System Database. Mr. Thomas's Location History section does not show any notes stating that medical personnel restricted him to the bottom range while he was housed at Pendleton.

The Classification Department at Pendleton places an inmate in the most appropriate setting possible and has final approval of where an inmate is placed. Just because an offender desires to live in a specific housing unit for whatever reason, there may be multiple factors (including availability, conduct record, victim/aggressor flags, potential for violence, etc.) that would cause the Classification Department to place him elsewhere.

Mr. Thomas requested a bottom range pass from Dr. Wolfe on several occasions, but was denied. Mr. Thomas wrote a letter to Andrew Cole, the Classification Supervisor dated February 8, 2011. The letter states that Mr. Thomas has done everything in his power to secure a bottom range permit due to his epilepsy, but his requests have been denied. See dkt. 126-3 at p. 4. Mr. Thomas was never given a bottom range pass while at Pendleton.

**D. Housing Placement**

Mr. Thomas arrived at Pendleton on October 30, 2009. From October 30, 2009 to November 13, 2009, Mr. Thomas was housed in a cell on the second tier in J Cell House.

From November 13, 2009, to February 25, 2011, Mr. Thomas was housed in H Cell House in a first tier cell.

From February 25, 2011, to May 11, 2011,[6] Mr. Thomas was housed in various cells in J Cell House and G Cell House on the second tier.

---

[6] He was housed for one day (from April 28, 2011, to April 29, 2011) in the infirmary.

From May 11, 2011 to October 31, 2011, Mr. Thomas was housed on the third tier in J Cell House.

On both October 15th and October 29th, 2011, Mr. Thomas suffered a seizure in which he fell down the stairs. Medical personnel were called to respond to these events.

Mr. Thomas states that both before and after his seizures in October 2011, he personally spoke to his counselor, defendant Fountain, and asked to be moved to a first floor range. Dkt. 126 at p. 37, ¶ 65. Specifically, On October 17, 2011, Mr. Thomas filed an informal complaint with several medical administrative officials and custody officials and personally handed Fountain his copy while speaking to him in his office. Within the informal complaint Mr. Thomas requested a bottom range permit, medical idle cell and medical idle state pay. Dkt. 126 at p. 38 ¶¶ 69-70. Mr. Fountain responded stating "don't see a need for bottom range and you already get idle pay. Medical will have to give your MID status then I'll change your pay." Dkt. 126 at p. 39, no. 74.

Mr. Thomas states that after the October 29, 2011 seizure he personally spoke to Mr. Fountain about his cell placement. Mr. Fountain responded that just because Mr. Thomas is epileptic does not mean he is eligible for a bottom range cell location. Dkt. 126 at p. 37, no. 66.

Mr. Thomas states that both before and after the seizure incidents he told Mr. Cole on several occasions that he needed to be moved off the third floor and that Mr. Cole did not tell him to raise the issue with his counselor. Dkt. 126 at p. 35, no. 60 and p. 34, no. 57.

Mr. Thomas admits that Mr. Cole and Mr. Fountain knew that Mr. Thomas was being seen regularly by medical personnel for treatment of his epilepsy.

From October 31, 2011, to Mr. Thomas's transfer to Wabash Valley Correctional Facility in April of 2012, Mr. Thomas was housed on a first tier cell. Mr. Thomas was moved to the bottom range as a "courtesy." He was not issued a bottom range pass.

10

**E. Mr. Thomas's Medical Treatment Related to His Claims**

Medical staff often takes blood work during the course of an offender's treatment to monitor a medical condition and medication levels. An offender's blood work is sent to a laboratory and the results are generated by the laboratory and entered into the offender's health record by the laboratory. Medical staff does not generate the laboratory findings or input the findings into the health record.

On June 25, 2009, Mr. Thomas was prescribed Dilantin for his epilepsy, but his laboratory levels registered at less than 6 (percent). Normal therapeutic levels for patients taking Dilantin as prescribed range from 10 to 20. If a patient's Dilantin level registers lower than 10, then the drug is considered non-therapeutic, meaning it has no effect on the patient.

On October 2, 2009, Mr. Thomas's Dilantin serum levels were at 0.6.

On November 6, 2009, Mr. Thomas was found lying on the floor of his cell with complaints of a possible seizure. He was taken to urgent care where his vitals were stable, he was oriented and alert, and he did not complain of pain. Mr. Thomas was sent back to his cell block after he was declared stable.

On January 19, 2010, Mr. Thomas's Dilantin serum levels were at 0.6, indicating he was not taking the medication as directed.

On March 15, 2010, Mr. Thomas was seen by Dr. Wolfe in a Chronic Care Clinic visit to monitor his epilepsy. Mr. Thomas told Dr. Wolfe that he has four to six seizures a year and requested a bottom bunk and bottom range pass. Dr. Wolfe noted that Mr. Thomas's epilepsy qualified him for a bottom bunk pass, but not for a bottom range, medical lay-in, medical idle status, or medical idle pay position.

11

On July 2, 2010, Mr. Thomas was seen by Dr. Wolfe in the Chronic Care Clinic for his epilepsy. Dr. Wolfe noted that Mr. Thomas's last seizure was six to eight months ago. Mr. Thomas's Dilantin levels continued to be non-therapeutic, and, despite this, his seizures were adequately controlled. Dr. Wolfe referred Mr. Thomas to mental health for his schizophrenia.

On July 7, 2010, Mr. Thomas's Dilantin serum levels were at 1.

On September 22, 2010, Mr. Thomas had a provider scheduled follow-up with Dr. Wolfe for his epilepsy. It was noted that his last self-reported seizure was one month ago and Mr. Thomas requested a bottom bunk.[7] Dr. Wolfe ordered a bottom bunk pass and scheduled a chronic care consultation with Mr. Thomas to monitor his epilepsy.

On October 7, 2010, Mr. Thomas was scheduled for a Chronic Care Clinic visit, but refused treatment for his epilepsy.

On January 18, 2011, Dr. Wolfe saw Mr. Thomas in a Chronic Care Clinic visit for his epilepsy. Mr. Thomas had no complaints or problems and had not suffered a documented seizure for over a year. Mr. Thomas's perceived non-compliance with medication was again discussed and Dr. Wolfe ordered a lab study of Mr. Thomas's Dilantin levels.

On January 24, 2011, Mr. Thomas's Dilantin serum levels were at a 0.9. On April 6, 2011, Mr. Thomas's Dilantin serum levels were at 2.1.

On April 22, 2011, Dr. Wolfe saw Mr. Thomas in a Chronic Care Clinic visit for his epilepsy. He noted that Mr. Thomas was still below the target Dilantin levels of 10-20, but his seizures were controlled. Mr. Thomas complained of left-calf pain and requested the medication Baclofen. Dr. Wolfe told Mr. Thomas that Baclofen was not approved for prescription because of

---

[7] Mr. Thomas states that he did not request a bottom bunk because he was in a single man cell with one bunk at the time.  See dkt. 126 at p. 17, no. 3.

its high drug value in the prison system and offered him alternative pain medication that was approved for distribution. Mr. Thomas declined the medication.

On June 29, 2011, Mr. Thomas's Dilantin prescription was re-filled.

On August 5, 2011, Dr. Wolfe examined Mr. Thomas in a Chronic Care Clinic visit for his epilepsy. Mr. Thomas told Dr. Wolfe that he suffered from a seizure in February 2011. Mr. Thomas did not report the seizure at that time, did not request medical evaluation, and did not report any problems stemming from it. Dr. Wolfe noted that Mr. Thomas's Dilantin levels were still low, at 2, but his seizures were in fair control. Dr. Wolfe ordered the Dilantin dose to remain the same but ordered a re-check of the serum level to determine whether to continue the medication. Dr. Wolfe told Mr. Thomas that his Dilantin was non-therapeutic and informed him of the treatment plan.

On August 25, 2011, Mr. Thomas's Dilantin serum levels were at a 0.9.

On August 26, 2011, Dr. Wolfe discontinued Mr. Thomas's Dilantin prescription because his serum levels were barely detectable and non-therapeutic for the past two years. Dr. Wolfe determined that it was not necessary to wean Mr. Thomas off Dilantin because he had, in essence, already weaned himself off the Dilantin through his non-compliance with the medication. Further tapering of his dose was unnecessary under these circumstances. Dr. Wolfe informed Mr. Thomas that his Dilantin was discontinued because his blood level was too low to be effective due to Mr. Thomas's non-compliance. Dr. Wolfe also told Mr. Thomas that if he wished to get back on the medication, he would need to take it as prescribed.[8]

---

[8] Mr. Thomas states that he "cannot understand why Dr. Wolfe did not give Mr. Thomas tests to determine his ("reoccurring") seizures before he ("DC'd") discontinued it" Dkt. 126 at p. 18, no. 9.  Mr.  Thomas also argues within his statement of material facts in dispute that Dr. Wolfe should have issued him a plastic I.D. bracelet or antiepileptic I.D. card to inform people he is a 55 year old epileptic inmate and should not be living on the third floor or working high-powered equipment.

On August 31, 2011, September 1, 2011, September 5, 2011 and September 6, 2011, Mr. Thomas submitted multiple, identical HCFs asking why his Dilantin prescription was stopped. The medical providers told Mr. Thomas several times that his Dilantin was discontinued because his blood levels were too low for it to be effective. Mr. Thomas was informed that if he agreed to take the medication as prescribed, the Dilantin would be re-started. Mr. Thomas was informed to notify the medical staff when he was ready to take the Dilantin as prescribed. Mr. Thomas also requested that the nurses who came to administer his medications on a daily basis re-start his Dilantin. The nurses told Mr. Thomas that Dr. Wolfe had discontinued his medication.

On October 15, 2011, Mr. Thomas had a seizure and fell down the stairs. That same day, Mr. Thomas was treated in the medical unit by Nurse Mary Blomquist. Based on Nurse Blomquist's examination, Dr. Elrod prescribed Mr. Thomas Tegretol, a seizure medication for 30 days. Nurse Blomquist ordered the Tegretol per Dr. Elrod's prescription and gave Mr. Thomas Tylenol for his pain and dry clothes (because he had urinated during the seizure). See dkt. 126-6 at p. 20-21.

On October 17, 2011, and October 18, 2011, Mr. Thomas submitted two HCFs asking to see a doctor for his complaints of headache, dizziness, blackouts, and back pain. On October 20, 2011, Nurse Shannon Coone treated Mr. Thomas for his complaints. Mr. Thomas was provided with ice compresses and the nurse contacted the provider.

On October 20, 2011, Nurse Shannon Coone treated Mr. Thomas for the complaints identified in the HCFs. Mr. Thomas continued on the seizure medication Tegretol. Nurse Coone gave Mr. Thomas ice compresses for his pain complaints and referred him to Nurse Practitioner Suffoletta for further care. See dkt. 115-7 at p. 40. Mr. Thomas states that on October 20, 2011, Suffoletta examined him and provided him with additional ice-compresses for the bruising/knot

14

on his forehead. Mr. Thomas states that he requested Dilantin and a brain scan, but was denied. He also requested a bottom range pass to prevent further injuries and she denied that request too.[9] Dkt. 126 at p. 23.

From October 25, 2011, through October 31, 2011, Mr. Thomas submitted five identical HCFs asking to see the doctor for his complaints of headache, dizziness, blackouts, and back pain. In response, medical staff told Mr. Thomas that he was previously examined on October 20, 2011, Dr. Wolfe had reviewed that treatment, and no further follow-up was recommended at that time.

On October 27, 2011, Dr. Wolfe ordered lab work and requested urgent care to schedule Mr. Thomas to be seen again for his complaints of dizziness. Dr. Wolfe also ordered a bottom bunk pass for Mr. Thomas for twelve months and a medical idle status for six months for his complaints of dizziness.[10] Mr. Thomas was not provided Dilantin or transferred off the third floor to a bottom range.

On October 29, 2011, Mr. Thomas suffered a seizure during which he fell from the third floor steel stairs and hit his head. Dkt. 126 at p. 21. The seizure was reported by Officer Watkins. Dkt. 126-10 at p. 23. Nurse Mary Blomquist evaluated Mr. Thomas and noted that his symptoms did not suggest a recent seizure. Nurse Blomquist noted that Mr. Thomas continued to receive Tegretol and that he had a two inch knot on his forehead and complained of his head hurting. Nurse Blomquist ordered Mr. Thomas to return to sick call if his symptoms did not subside. See dkt. 126-6 at p. 23.

---

[9] Nurse Suffoletta testified that on November 3, 2011, she reviewed Mr. Thomas's lab work, but denies providing any other treatment to Mr. Thomas. She specifically states that she did not provide treatment following his alleged seizures.

[10] Mr. Thomas suggests that the bottom bunk pass was irrelevant because he was already in a single man cell. Dkt. 126 at p. 20, no. 14.

On October 31, 2011, Dr. Wolfe examined Mr. Thomas in a Chronic Care Clinic visit and noted that Mr. Thomas complained of two seizures in the past six weeks and resulting back pain. Dr. Wolfe placed Mr. Thomas back on Dilantin and ordered x-rays of his spine, shoulders and wrist. Mr. Thomas requested two unauthorized narcotics for his back pain that had high re-sale value within the prison. Dr. Wolfe refused to prescribe the unauthorized narcotics, but prescribed Mr. Thomas Mobic for his back pain. See dkt. 126-5 at p. 18.

On November 3, 2011, Mr. Thomas presented to Nurse Practitioner Suffoletta for review of a lab report and liver function studies.

On November 4, 2011, Mr. Thomas suffered another seizure while in the chow hall for dinner. The seizure was observed by custody staff members. Dkts. 126-6 at p. 24.  Dr. Wolfe was notified and ordered Mr. Thomas's Dilantin dose increased. Dkt. 126 at p. 22.

From November 8, 2011 through November 14, 2011, Mr. Thomas submitted fourteen HCFs requesting treatment and medications for his headaches and back pain following his fall. Medical staff told Mr. Thomas that his Dilantin had been renewed given his seizures, he was already on the strongest combination of pain medications available, and Dr. Wolfe had already requested x-rays. Mr. Thomas was also repeatedly told that his requests were addressed and he was abusing the healthcare request system with his voluminous, repetitive requests.

On November 14, 2011, Dr. Wolfe's x-ray order for Mr. Thomas's back was approved. On November 15, 2011, Mr. Thomas refused x-rays of his back.

On November 17, 2011, Dr. Wolfe ordered Mr. Thomas's Dilantin dose increased in an effort to make the drug therapeutic for Mr. Thomas. Around the same time, the nursing staff reported that Mr. Thomas was hoarding Mobic and Dr. Wolfe cancelled the Mobic prescription.

From November 18, 2011, through November 22, 2011, Mr. Thomas submitted five identical HCFs continuing to request treatment and medications for his headaches and back pain following his fall. Medical staff advised Mr. Thomas that his requests were previously addressed on numerous occasions.

On November 16, 2011, Mr. Thomas's Dilantin serum levels were again non-therapeutic and registered at 8.7.

On November 28, 2011, Mr. Thomas's request for a handicapped cell was denied because Dr. Wolfe determined there was no medical rationale for the assignment.

On December 9, 2011, the nursing staff reported that Mr. Thomas was "palming" his medication, which means he was hiding them in his palm and pretending to take them. Dr. Wolfe ordered Mr. Thomas's Dilantin be administered in powder form in a cup of water rather than in pill form. On December 30, 2011, Mr. Thomas refused his crushed Dilantin. Mr. Thomas states that Nurse Ashby fabricated the story to Dr. Wolfe that he was palming the Mobic she delivered. Dkt. 126 at p. 29-30.

From January 1, 2012, through January 13, 2012, Mr. Thomas submitted nine identical HCFs complaining of pain and injury following his fall down the stairs. Mr. Thomas also complained of "malfeasance" and "malicious act" by Nurse Ashby because she was crushing his Dilantin and administering it in water. Mr. Thomas was advised to submit one issue on one form and not duplicates. Mr. Thomas was also told that his concerns were forwarded to the medical staff and his medication was administered crushed per a physician's orders.

On January 16, 2012, Mr. Thomas presented to Nurse Wallen with three identical requests for treatment in the same day alleging injury from a seizure. Mr. Thomas was advised to submit all three complaints in one form. Mr. Thomas told Nurse Wallen "I don't like your attitude" and

left the medical unit room. Although Mr. Thomas states that while Nurse Wallen has a nasty personality, he doesn't remember saying anything about her attitude. Dkt. 126 at p. 25. Officers report that Mr. Thomas asked for five to seven health care requests forms frequently.

On January 17, 2012, Dr. Wolfe saw Mr. Thomas in a Chronic Care Clinic visit for his epilepsy. Mr. Thomas complained of back pain and the nursing staff falsifying records. Dr. Wolfe saw no evidence of falsified medical records. Dr. Wolfe renewed Mr. Thomas's bottom bunk pass, continued Dilantin in powder form, and renewed a prescription for Mobic.

On March 22, 2012, Dr. Wolfe saw Mr. Thomas in a provider scheduled visit for his complaints of left shoulder, wrist, elbow, ribs, and knee pain after an altercation with officers. Mr. Thomas displayed no objective signs of pain or injury. Dr. Wolfe prescribed Mobic and ordered x-rays of Mr. Thomas's shoulder, ribs, cervical spine, and knee. On March 26, 2012, Mr. Thomas refused the ordered x-rays and reported to the x-ray technician that he felt fine and no longer had pain. The x-ray order was discontinued.

In April of 2012, Mr. Thomas was transferred to Wabash Valley Correctional Facility.

## F. Mr. Thomas's Review of Health Records

The offender health record is a combination of paper chart and electronic documentation and is an official record of the care provided to offenders by the IDOC health services staff. Documentation in the health record includes, but is not limited, to offender demographics, allergies, progress notes, chronic problem list, past medical history, drug orders, vital signs, intake and transfer screens, immunizations and laboratory data. Offenders are allowed access to their health record upon request.

An offender is allowed to review his or her health record and make copies of any part to which access has been permitted. The offender is charged 10 cents per page for copies of a health

record. The medical records clerk maintains the paper and electronic health records in the regular course of business, oversees requests for health records, and facilitates in-person offender reviews and copying of health records.

On October 4, 2011, Mr. Thomas submitted a HCF requesting review of his medical records. In response, Mr. Thomas was notified that a packet review was scheduled with the medical records clerk, defendant Yvonne Goodson, on October 11, 2011. Regardless, from October 6, 2011 through October 10, 2011, Mr. Thomas submitted five other identical HCFs demanding a review of his health records. Mr. Thomas was informed on each occasion that his requests were already addressed in a prior request.

On October 11, 2011, Ms. Goodson met with Mr. Thomas for his scheduled health record packet review. She informed Mr. Thomas that his earlier 2009 records were stored in an electronic data base and could be accessed at a copying fee of 10 cents per page.[11]

Between October 31, 2011, and November 7, 2011, Mr. Thomas continued to submit HCFs requesting review of his medical records. Mr. Thomas was repeatedly informed that his medical records review request was previously concluded and that copies cost 10 cents a page and he needed money in his account to pay for any copies before they would be provided.

On November 15, 2011, Ms. Goodson submitted a Conduct Report stating that Mr. Thomas's excessive HCFs hindered her ability to do her job and requesting that Mr. Thomas's misuse of the HCF process stop. Mr. Thomas was found not guilty of the Conduct Report.

During his incarceration, Mr. Thomas was never disciplined for submitting repetitive and harassing HCFs.

---

[11] Thomas complains that during his review he asked Goodson to call or email Dr. Wolfe to have his Dilantin medications restarted, but she said no. Dkt. 126 at p. 31.

19

## IV.  Medical Defendants' Motion for Summary Judgment

The Medical Defendants argue that Dr. Wolfe and Nurse Practitioner Suffoletta were not deliberately indifferent to Mr. Thomas's medical needs by failing to prescribe Dilantin, that Yvonne Goodson did not retaliate against Mr. Thomas, and that there is no evidence to substantiate any claim that any defendant falsified Mr. Thomas's medical records or laboratory tests.

### A.  Eighth Amendment Deliberate Indifference

In order for an inmate to state a claim under § 1983 for medical mistreatment or denial of medical care, the prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, "[t]o determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter, et al.,* No. 14-2674 at 5-6 (7th Cir. Aug. 23, 2016) (en banc) (Slip Opinion).

In this case, there is no dispute that epilepsy is an objectively serious medical condition. What is disputed is whether the defendants acted with deliberate indifference in treating that medical condition. In determining whether a prison official acted with deliberate indifference, the Seventh Circuit has provided the following guidance:

> For a prison official's acts or omissions to constitute deliberate indifference, a plaintiff does not need to show that the official intended harm or believed that harm would occur. [*Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).] But showing mere negligence is not enough. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) ("Deliberate indifference is not medical malpractice."). Even objective recklessness—failing to act in the face of

20

> an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim. *Farmer*, 511 U.S. at 836–38. Instead, the Supreme Court has instructed us that a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. *Id*. at 837. Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety. *Id*. at 844.

*Petties*, No. 14-2674 at p. 6-7. "If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Id.* (*citing Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

### 1. Dilantin

Mr. Thomas alleged in his complaint that Dr. Wolfe and Nurse Practitioner Suffoletta violated his Eighth Amendment rights by denying him Dilantin to treat his seizure disorder. The Medical Defendants argue that they are entitled to summary judgment because the medical records establish that they were not deliberately indifferent to Mr. Thomas's medical needs, were responsive to Mr. Thomas's requests for treatment, and wrote appropriate orders.

The Medical Defendants' argument is persuasive. As to Dr. Wolfe, the record reflects that since 2009, Mr. Thomas's blood results have shown non-therapeutic Dilantin levels. These results indicate that Mr. Thomas did not have sufficient levels of the medication to affect his epileptic condition. Dr. Wolfe believed the results reflected that Mr. Thomas was not taking the medication as prescribed. There is no admissible evidence to support Mr. Thomas's assertion that his body chemistry digests Dilantin and psychotropic medications differently from other patients. On August 26, 2011, after years of non-therapeutic Dilantin levels, Dr. Wolfe determined that Mr. Thomas's Dilantin prescription needed to be discontinued. Dr. Wolfe determined that Mr. Thomas's Dilantin could be discontinued safely without weaning him off the medication because

Mr. Thomas had essentially weaned himself off Dilantin through his noncompliance and because he was not experiencing seizure activity. Dkt. 139 at pp. 2, 18. After Dr. Wolfe discontinued Mr. Thomas's Dilantin prescription, he continued to monitor Mr. Thomas's epileptic condition.

On October 15, 2011, Mr. Thomas had a seizure and fell down the stairs. That same day, Dr. Elrod prescribed Mr. Thomas Tegretrol, a seizure medication for thirty days. On October 29, 2011, Mr. Thomas suffered another seizure and was treated by other medical providers. When Dr. Wolfe examined Mr. Thomas on October 31, 2011, he restarted Mr. Thomas's Dilantin regimen.

This is not a case where there is any evidence that Dr. Wolfe refused to take instructions from a specialist; failed to follow an existing protocol; persisted in a course of treatment known to be ineffective; chose an easier and less effective course of treatment without exercising professional judgment; or inexplicably delayed treatment. *See Petties*, No. 14-2674 at p. 9 (discussing what kind of evidence is adequate for a jury to draw a reasonable inference that a prison official acted with deliberate indifference). Instead, Dr. Wolfe regularly monitored Mr. Thomas's epileptic condition. He relied on laboratory reports to determine that the Dilantin was not providing any benefit to Mr. Thomas before stopping this medication. When Mr. Thomas had a seizure on October 15, 2011, he was provided with a different medication, Tegretrol, and when that proved ineffective because Mr. Thomas had another seizure on October 29, 2011, Dr. Wolfe switched Mr. Thomas back to Dilantin. When laboratory reports continued to show non-therapeutic Dilantin serum levels throughout November 2011, Dr. Wolfe ordered Mr. Thomas's Dilantin to be administered in powder form in a cup of water rather than in pill form to rule out "palming" of the medication. Under these circumstances, Dr. Wolfe was not deliberately indifferent to Mr. Thomas's epilepsy.

As to Nurse Practitioner Suffoletta, the medical records establish that her involvement in Mr. Thomas's treatment was limited. Mr. Thomas cannot establish that Nurse Practitioner Suffoletta discontinued his Dilantin or played any role in that determination. Dr. Wolfe was responsible for treating Mr. Thomas's epilepsy. Individuals can only be liable under § 1983 if they had "personal involvement in the alleged constitutional deprivation." *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010)(citations and quotations omitted). Because the evidence proves that Nurse Practitioner Suffoletta was not involved in the alleged unconstitutional denial of Dilantin, summary judgment is proper.

**2. Bottom Range Pass**

Mr. Thomas alleges that Dr. Wolfe and Nurse Practitioner Suffoletta denied Mr. Thomas a bottom range pass and as a result, Mr. Thomas had a seizure and injured himself on the stairs in violation of the Eighth Amendment. The Medical Defendants do not address this claim directly in their briefing, though relevant evidence was provided. This can only be understood as a failure to move for summary judgment on this claim.  Out of an abundance of caution, the Court will address the issue.

Dr. Wolfe testified in his affidavit that Mr. Thomas's epilepsy qualified him for a bottom bunk pass, but not for a bottom range pass. In addition, IDOC policy (according to Dr. Wolfe) is that a bottom bunk pass is given to seizure patients to minimize injuries if they fall out of bed during a seizure. Bottom range assignments are indicated for patients with mobility limitations, for example, patients with artificial limbs or requiring the use of a wheel chair.

Based on the current record viewed in the light most favorable to Mr. Thomas, a reasonable jury could conclude that Mr. Thomas's seizure disorder warranted his placement on the lower range.  On two occasions he had a seizure on the stairs, fell, and was injured. After the first seizure

on the stairs he was not given a bottom range pass, even after the second seizure he was not given a bottom range pass. Under these circumstances, the risk of falling down the stairs while having a seizure is a risk apparent to even a lay person. The fact that the IDOC may have had a practice or policy that bottom range assignments were indicated only for patients with mobility issues does not absolve IDOC or the medical providers from considering the risk of harm an upper range placement could present to a prisoner with epilepsy. The individual defendants are not entitled to rely on such policy or practice to protect themselves from liability. If a defendant assigns an inmate to housing that the defendant knew was likely to cause the inmate injury, he violates the Eighth Amendment. *Herron v. Meyer*, 820 F.3d 860, 863 (7th Cir. 2016) (rejecting claim that defendant was entitled to summary judgment because he was following policy of moving every inmate who objects to a new cellmate where the cell to which plaintiff was moved was likely to cause injury).

For these reasons, Dr. Wolfe and Nurse Practitioner Suffoletta are not entitled to summary judgment on the claim that they were deliberately indifferent to the risk Mr. Thomas faced given his epilepsy and placement on an upper range. This claim will be resolved through settlement or at trial.

## B. Medical Records

Next, Mr. Thomas alleges that Nurse Mary Blomquist, Nurse Wallen, Nurse Lindy Ashby and Medical Records Clerk Yvonne Goodson falsified records, the effect of which was that Mr. Thomas was denied medical care for his seizures. The Medical Defendants adequately set forth Mr. Thomas's specific claims as follows: (1) Nurse Blomquist allegedly failed to update Mr. Thomas's chart to show the September 15, 2011 seizure and injuries he suffered; (2) Goodson tampered with Mr. Thomas's medical records to show low Dilantin levels; (3) Nurse Ashby falsely reported that Mr. Thomas was hoarding his Mobic medications; and (4) Nurse Wallen allegedly

falsified information in Mr. Thomas's chart and he was denied medical treatment for his pain. In response, the Medical Defendants argue that Mr. Thomas has not submitted any evidence to reflect that the Medical Defendants' actions caused him harm or which suggests that any of the Medical Defendants were deliberately indifferent to Mr. Thomas's serious medical needs. Claims against each of the four defendants are discussed below.

**1. Nurse Blomquist**

As to Nurse Blomquist, Mr. Thomas claims that on October 29, 2011, Nurse Blomquist noted an "unwitnessed seizure" in her medical charting. Mr. Thomas, however, insists that his seizure was witnessed by the officials. Pltf.'s Resp. to MSJ, p. 8. In fact, the medical records reflect that the seizure was reported by Officer Watkins. Dkt. 126-10 at p. 23. But even if Nurse Blomquist's recording of the seizure as "unwitnessed" was in error, Mr. Thomas received immediate treatment and medication for his complaints.

Next, Mr. Thomas contends that on October 29, 2011, Nurse Blomquist did not identify Mr. Thomas's knot on his forehead in the medical record, but Mr. Thomas is mistaken because the medical record specifically identifies that complaint. Dkt. 126-6 at p. 23. Regardless, Mr. Thomas admits that he received medical treatment for that injury from Nurse Practitioner Suffoletta. Dkt. 126 at p. 26, no. 33.

Under these circumstances, the purported errors in the medical record are insufficient to suggest that Nurse Blomquist was deliberately indifferent to Mr. Thomas's serious medical needs. Given the insufficiency of the evidence to support his claim against Nurse Blomquist, she is entitled to judgment in her favor on Mr. Mr. Thomas's medical records claim as a matter of law.

### 2. Ms. Goodson.

In regards to Ms. Goodson, Mr. Thomas asserts that she tampered with Mr. Thomas's medical records to show low Dilantin levels. But there is no evidence, beyond Mr. Thomas's unsupported allegations, that Ms. Goodson had the authority, let alone the ability, to manipulate his laboratory results. Rather, the evidence establishes that Ms. Goodson is the custodian of medical records and does not generate or update medical data. All laboratory results from blood draws are generated by the laboratory and transferred electronically to the medical records from the laboratory.  In a complete absence of any evidence to support his claim against Ms. Goodson, she is entitled to judgment in her favor on Mr. Thomas's medical records claim as a matter of law.

### 3.  Nurse Ashby

Thomas alleges that Nurse Ashby "fabricated a story to Dr. Wolfe that [he] was ("palming") [his] Mobic pain meds when [he] showed her the Mobic she delivered and ask her for the milligram [he] was accused of ("palming")." Dkt. 126 at p. 29. Thomas claims that as a result of Nurse Ashby's report, Dr. Wolfe discontinued his Mobic pain medications and Dilantin.  There is no evidence to support Mr. Thomas's allegations. There is no evidence that Nurse Ashby reported that Mr. Thomas was palming Mobic. Even if she did make this report, there is no evidence that she did not believe it to be true. In addition, it was Dr. Wolfe and not Nurse Ashby who stopped the prescription. In a complete absence of any evidence to support his claim against Nurse Ashby, she is entitled to judgment in her favor on Mr. Thomas's medical records claim as a matter of law.

### 4. Nurse Wallen

Mr. Thomas claims that on January 16, 2012, Nurse Wallen noted in Mr. Thomas's medical records that Mr. Thomas said "I don't like your attitude" and left the medical unit room. Mr.

Thomas asserts that he did not make that statement to Nurse Wallen. Even if this record is inaccurate, Mr. Thomas has not shown that he was injured by this statement. Dr. Wolfe treated Mr. Thomas for his complaints the very next day and continued his Dilantin and prescribed pain medication. Nurse Wallen could not have prescribed Mr. Thomas medication even if she wanted to do so. Thus, these inconsistencies (even if true) are insufficient to establish deliberate indifference to Mr. Thomas's medical condition.

Accordingly, Nurse Wallen and the other Medical Defendants are entitled to summary judgment as to the claim that they falsified records in order to deny Mr. Thomas medical care for his seizures.

## C. First Amendment Retaliation Claim

Mr. Thomas claims that Medical Records Clerk Yvonne Goodson retaliated against him by issuing him a conduct report for submitting multiple identical HCFs requesting review of his medical records.

To prevail on a First Amendment retaliation claim, Mr. Thomas "must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

Ms. Goodson argues that she is entitled to judgment as a matter of law. Ms. Goodson's position is correct. In the Seventh Circuit, courts must "apply the *Turner* legitimate penological interests test to determine whether [the plaintiff prisoner] has . . . engaged in protected speech" when considering a claim of retaliation. *Bridges*, 557 F.3d at 551. This test states that "when a

prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

In this case, Ms. Goodson wrote a conduct report charging Mr. Thomas with interference of staff in performance of their duties. Specifically, Ms. Goodson alleged that Mr. Thomas was abusing the HCF procedure by submitting the same HCF over and over seeking copies of his medical records. Dkt. 1-4 at p. 40 (case number ISR 11-11-0087). There is an obvious legitimate penological interest in requiring inmates to properly submit requests for healthcare. Abuse of the system serves only to delay the review of legitimate requests.

In addition, Mr. Thomas was found not guilty of the offense. Dkt. 1-4 at p. 41. Thus, he did not suffer a deprivation that would likely deter First Amendment activity in the future. "A single retaliatory disciplinary charge that is later dismissed is insufficient to serve as the basis of a § 1983 action." *Bridges,* 557 F.3d at 555 (citing *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir. 1982) ("A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise....")).

Accordingly, Ms. Goodson did not retaliate against Mr. Thomas and she is entitled to judgment as a matter of law.

## V. State Defendants' Motion for Summary Judgment

Mr. Thomas suffers from epilepsy and as a result of that condition he suffers seizures. According to Mr. Thomas, his condition and the potential effects thereof necessitate that he be housed in a bottom range cell.  He alleges that the State Defendants had authority to issue him a bottom range pass but that they refused to do so, resulting in an unconstitutional condition of confinement.

28

In order to prevail on a claim under § 1983 asserting that a condition of confinement rises to the level of a violation of the Eighth Amendment, the plaintiff must show: (1) he suffered a sufficiently serious deprivation, and; (2) the defendants acted with deliberate indifference to a substantial risk of serious harm. *Farmer*, 511 U.S. at 834 (1994); *Delaney v. DeTella*, 256 F.3d 679, 682-83 (7th Cir. 2001).

All parties acknowledge that Mr. Thomas suffered from seizures, requested a bottom range pass for medical reasons, but was not issued a bottom range pass while at Pendleton. The State Defendants argue, however, that they are entitled to summary judgment because they relied on the medical department's determination that Mr. Thomas did not need a bottom range pass. In other words, the State Defendants argue that even if the failure to assign Mr. Thomas to a bottom range throughout his stay at Pendleton created a sufficiently serious deprivation given his epilepsy, the State Defendants did not act with deliberate indifference to the substantial risk of serious harm because they were not aware of the risk.

The State Defendants argument is rejected because there are material facts in dispute and they are not entitled to judgment as a matter of law. A reasonable jury could find that the State Defendants reasonably relied on the medical providers' assessment that a bottom range pass was not warranted. A reasonable jury could also conclude that the risk of harm inherent in having a seizure and falling down the stairs should be obvious to a lay person, and that it was custody staff (not the medical staff) that ultimately determined where any individual prisoner is placed. In addition, custody staff were (at a minimum) on notice regarding the risk of injury after Mr. Thomas was injured falling down the stairs during his seizure on October 15, 2011. By failing to assign Mr. Thomas to a bottom range, a reasonable jury could conclude that the State Defendants were deliberately indifferent to a serious risk of harm to him. *See Jones v. Tatlock*, 2016 WL 1700373,

at *4 (S.D. Ind. Apr. 28, 2016) (denying summary judgment on claim that defendants was denied placement in a lower bunk); *Bolling v. Carter*, 819 F.3d 1035 (7th Cir. 2016) (reversing summary judgment on a pre-trial detainee's Fourteenth Amendment claim where the detainee obtained a lower bunk pass but was assigned to an upper bunk and fell); *see also Herron,* 820 F.3d 860 (reversing summary judgment on a claim brought by a wheelchair bound prisoner where the prisoner was assigned to a non-accessible cell and was injured attempting to use the bathroom).

Given the material facts in dispute, the State Defendants are not entitled to qualified immunity. Accordingly, the State Defendants' motion for summary judgment [dkt 116] is **denied.**

## VI. Conclusion

The plaintiff's motion for a ruling [dkt. 151] is **granted.**

The Medical Defendants' motion for summary judgment [dkt 113] is **granted in part and denied in part.** Nurse Deborah Wallen, Nurse Mary Blomquist, Nurse Linda Ashby and Yvonne Goodson are each entitled to judgment as a matter of law as to all claims alleged against them. The **clerk is directed** to update the docket to reflect that these four medical defendants have been terminated in this action.

The motion for summary judgment [dkt. 116] filed by State Defendants Andrew Cole and Danny Fountain is **denied.**

The defendants' motion to strike [dkt. 137] is **denied.**

The plaintiff's belated motion for expert witness [dkt. 149] is **denied** because there is no evident need for a court-appointed expert, to "assist the trier-of-fact to understand the evidence or decide a fact in issue," the standard under Rule 702 of the Federal Rules of Evidence. *Ledford v. Sullivan*, 105 F.3d 354, 358 -359 (7th Cir. 1997) (citing Fed. R. Evid. 702).

The two Eighth Amendment claims remaining for resolution are the following:

- Whether Doctor William H. Wolfe and Nurse Practitioner Vanessa G. Suffoletta denied Mr. Thomas a bottom range pass and, as a result, Mr. Thomas had two seizures and injured himself on the stairs; and

- Whether Andrew Cole and Counselor Fountain had the authority to move Mr. Thomas to a bottom range but refused to do so even after they knew of the risk of harm inherent in having a seizure on the stairs.

No partial final judgment shall issue at this time as to the claims resolved in this Entry.

**IT IS SO ORDERED.**


Date:  September 2, 2016

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

LEONARD THOMAS
175876
New Castle Correctional Facility-Inmate Mail/Parcels
1000 Van Nuys Road
New Castle, IN  47362

All Electronically Registered Counsel